Sarah Moffitt GOODSON and Floyd P. Goodson, Sr., Co-Executors of the Estate of Floyd P. Goodson, Jr., Deceased

v.

AMERICAN HOME ASSURANCE COMPANY.

Civ. A. No. 5324.

United States District Court
E. D. Tennessee, N. D.

Feb. 25, 1966.

**126**

McAfee Lee, Knoxville, Tenn., for plaintiffs.

E. Bruce Foster, Frantz, McConnell & Seymour, Knoxville, Tenn., for defendant.

ROBERT L. TAYLOR, Chief Judge.

This action was filed by Sarah Moffitt Goodson and Floyd P. Goodson, Sr., Co-Executors of the estate of Floyd P. Goodson, Jr., against the American Home Assurance Company to recover the sum of $100,000.00, plus interest and penalty, allegedly due and owing on an insurance policy covering Accidental Death and Dismemberment issued by the defendant and covering the life of Floyd P. Goodson, Jr., who met his death in an airplane crash on October 29, 1964 at Shelbyville, Tennessee.

The following facts were stipulated:

(1) That the death of Floyd P. Goodson, Jr. resulted from the crash of an airplane at Shelbyville, Tennessee on October 29, 1964.

(2) That at the time of the crash, the airplane was being used on the business of JFG Coffee Company.

(3) That said airplane was owned by H. T. Hackney Company and was at the time of its crash rented to JFG Coffee Company.

(4) That the aircraft in question at the time of the crash had a current and valid airworthiness certificate and was then being piloted by Arthur J. Fisher, Jr., who at that time held a valid and current certificate of competency of a rating authorizing him to pilot said aircraft.

(5) That at the time of his death, Floyd P. Goodson, Jr. was the President of JFG Coffee Company.

(6) That Floyd P. Goodson, Jr. made the arrangements with Arthur Fisher, Jr. to pilot the airplane on October 29, 1964.

(7) That JFG Coffee Company paid Arthur Fisher, Jr. for piloting the aircraft on his separate invoice.

(8) That JFG Coffee Company paid H. T. Hackney Company on its separate invoice for use of the airplane.

(9) The policyholder did not seek or obtain prior written permission of the defendant as provided under Exclusion 5, Section II, Part B of the policy.

"J.F.G. COFFEE COMPANY" was the named policyholder in the policy and F. P. Goodson, Sr., F. P. Goodson, Jr. and J. A. McReynolds were the sole members

of the class covered by the policy. The members of the class were stockholders and officials of the policyholder. JFG Coffee Company, hereinafter sometimes called JFG, is what is known as a closed or family corporation owned by the Goodson family and their relatives by blood and marriage, and is engaged in the coffee roasting business in Knoxville, Tennessee. The business was commenced by F. P. Goodson, Sr. in 1921.

The policy in question was written through Blair Agency of New York as the defendant does not have employed agents. It is in the nature of a group policy and would not have been written if JFG had not been a member of the National Coffee Association. The policy is described as a "Hazard H–12, 24–Hour Accident Protection While on a Trip— Business Only" policy. Below are some of the pertinent provisions under Section II, Part B.

At the top of the page are the following words in large heavy type "Excluding Policyholder Owned Aircraft." Under the "DESCRIPTION OF HAZARDS" it is stated:

"Such insurance includes such injury sustained during such trip while the Insured Person is riding as a passenger (but not as a pilot, operator or member of the crew) in or on, boarding or alighting from:

"(1) any civilian aircraft having a current and valid airworthiness certificate, and piloted by a person who then holds a valid and current certificate of competency of a rating authorizing him to pilot such aircraft; * * *"

The parties agree that the aircraft involved in the crash was not owned by the JFG Coffee Company; that it had an airworthiness certificate and that Arthur Fisher, Jr., its pilot on the day of the crash, was a certificated pilot of a rating authorizing him to pilot such aircraft.

The five exclusions contained in the policy in small light type are as follows:

"Such insurance as is afforded an Insured Person to which this Hazard H–12 applies, does not apply to any loss, fatal or non-fatal, caused by or resulting from injury sustained while the Insured Person is:

"(1) flying in any aircraft being used for or in connection with acrobatic or stunt flying, racing or endurance tests;

"(2) flying in. any rocket-propelled aircraft;

"(3) flying in any aircraft being used for or in connection with crop dusting or seeding or spraying, fire fighting, exploration, pipe or power line inspection, any form of hunting bird or fowl herding, aerial photography, banner towing or any test or experimental purpose, unless previously consented to in writing by the Company;

"(4) flying in any aircraft which is engaged in any flight which requires a special permit or waiver from the authority having jurisdiction over civil aviation, even though granted, unless previously consented to in writing by the Company;

"(5) flying in any aircraft owned or operated by the Policyholder, unless previously consented to in writing by the Company."

Defendant asserts that the airplane was operated by the policyholder, JFG, at the time of the crash and that under exemption No. (5) F. P. Goodson, Jr. was not covered.

The parties appear to be in agreement as to the rules that generally govern the rights of the parties to insurance contracts, but are in sharp disagreement as to the application of these rules to the facts in this case. These rules are as follows:

(1) The policy will be construed according to the laws of Tennessee since it was issued on the lives of Tennessee residents and delivered in Tennessee. 56–1102 T.C.A. King v. Mutual Life Insurance Company of New York, 114 F.Supp. 700 (D.C.E.D.Tenn.)

■ (2) Ambiguities shall be construed against the insurer and in favor of the insured. In the absence of an ambiguity, there is no room for construction. McNally v. American States Insurance Company, 308 F.2d 438 (C.A.6)

■ (3) Language in the policy which is not ambiguous will be given its ordinary, every day meaning. Farmers Mutual Fire Insurance Company v. McMillan, Tenn., 395 S.W.2d 798.

■ (4) The intention of the parties in insurance contracts, like other contracts, is to prevail. Moore v. Life & Casualty Insurance Company, 162 Tenn. 682, 40 S.W.2d 403.

■ (5) An insurance company has a right under its freedom of contract to place an exclusion clause in its policy when it deemed it necessary for its protection against extensive risks. Bennett v. Metropolitan Life Insurance Company, 206 Tenn. 652, 658, 337 S.W.2d 9.

■ (6) Where reasonable and proper, insurance contracts will be construed to afford coverage.

With these rules in mind, we proceed to examine the pertinent parts of the policy and the circumstances under which the aircraft was obtained by JFG from the Hackney Company, the owner of the aircraft.

The key words in the insurance contract are "operated by," to be found under Section 5 of the exclusions. The parties are not in agreement as to the meaning of these words. The terms "while on business of the policyholder" and "airworthiness certificate" are defined in the policy, but the words "operated by" are not defined. Plaintiffs contend that the failure to define these words creates an ambiguity in the policy and that the language contained in large letters "Excluding Policyholder Owned Aircraft" led the policyholder to believe that flying by the named insureds in any commercial or private chartered aircraft was covered and that by incorporating the words "or operated by" in an obscure place in exclusion No. (5), the insurer not only misled the insured but created an additional ambiguity, and that for these reasons the words should not be construed as excluding F. P. Goodson, Jr. from coverage.

Plaintiffs argue that the intent of the policyholder is important and that the policyholder in this case intended to be covered while the named insureds were riding in aircraft other than the kind of aircraft excluded in exclusions Nos. 1, 2, 3 and 4. Plaintiffs say that the flight that resulted in the crash was essentially that of a chartered flight.

Defendant contends that the aircraft was operated by JFG on the day that it crashed. It bases its contention upon the premise that Arthur Fisher, Jr. was an employee of JFG at the time of the crash. But it is frank to admit that if Fisher were not an employee of JFG or if he were an independent contractor at the time of the crash, F. P. Goodson, Jr. was covered by the policy.

Defendant argues, and has proof to support its argument, that it would have issued a policy to the policyholder to cover the circumstances of the crash as it sees them, but that the premium would have been approximately $100.00 more if issued on an annual basis, or five or six cents per mile if issued on a trip basis. It says that experience shows that the risk is greater where the aircraft is owned or operated by the policyholder for the reason that pilots, because of the desire to carry out the wishes of the president of the policyholder or its other high officials, will take chances in flying that will not be taken by commercial airlines or by independent chartered companies.

Plaintiffs say that the flight in question was in the nature of a chartered flight. F. P. Goodson, Sr. was the Chairman of the Board of JFG at the time of the crash. His son, F. P. Goodson, Jr. was President and J. A. McReynolds was Vice President. Goodson, Sr. formulated the policy of the company, or at least played a leading part in its formulation. Goodson, Jr. handled the arrangements with the H. T. Hackney Company for the flying of the aircraft. It was flown six

times prior to the date of the crash. The Fisher vouchers show that he submitted his bills to Floyd Goodson for his services on each flight and that they were paid by the JFG Company. These bills totaled approximately $150.00. The bills of H. T. Hackney Company were submitted to and paid by JFG Coffee Company, the first bill, which covered the trips August 10 and August 21, 1964, amounted to $182.00 and the second, which covered the trips September 4, September 23 and September 26, 1964 amounted to $257.40.

From the time H. T. Hackney Company purchased the airplane, which was a second-hand one, in either April or May, 1964, it put on it about 119 hours of flying time up to the date of the crash, during all of which time the aircraft was piloted by Arthur Fisher, Jr. Hackney used the aircraft about two-thirds of the time and rented it or leased it to third parties, including Security Mills, Knoxville Buick Company, Knoxville-Maryville Express Company, Henry T. Ogle, B. A. Morton, Jr., Howard Baker, Jr. and JFG Coffee Company, the remaining one-third of the time.

Goodson, Sr. and McReynolds were notified by Goodson, Jr., following a luncheon at the City Club in Knoxville (the exact date not being shown but presumably some time prior to August 10, 1964 which appears to be the first time JFG used the aircraft) that he had made arrangements with Hackney to rent the aircraft. He stated that Hackney was to receive $40.00 per hour rental. Neither Goodson, Sr. nor McReynolds understood that written permission of the insurance company was necessary in order for the flights in the Hackney airplane to be covered.

Goodson, Sr. didn't know that Fisher was being paid by JFG by separate checks for piloting the airplane until after the accident. He never read the five exclusions, although he looked over the policy. He described the arrangements made by his son with the Hackney people as a loose arrangement. Mr. Morton was the person who represented the Hackney people in the aircraft arrangement with JFG. JFG could rent the airplane any time it was available. Arthur Fisher was to be the pilot. Arthur Fisher's regular job was FAA Controller or Tower Operator at the McGhee-Tyson Airport, Knoxville. JFG uses two types of checks to pay its bills, namely payroll checks and account checks. Account checks were used to pay Fisher. Neither withholding nor social security deductions were made in the payments to Fisher. Nor was Fisher given any fringe benefits which JFG gives to its other employees. JFG didn't consider Fisher an employee. JFG has been advised since the accident that there are some indications that it was to pay in addition to the $40.00 per hour flying time, gas and oil used in the aircraft while in its use. McReynolds considered JFG's relation to the flights in the nature of charter flights. He believed that JFG was covered under the policy. Goodson, Jr. was not licensed to fly an aircraft.

Carl Campbell, Vice President of H. T. Hackney Company, representing Hackney, stated that he agreed to rent the airplane to Goodson, Jr. on October 29, 1964, or the day of the crash. Goodson called him about ten days prior to that time and asked him if he could use it on that date and he told him that if it was not in use he could have it. Two or three days later, he called Goodson and told him he could use it. The agreement was, according to Campbell, that JFG was to pay Hackney $35.00 per hour for flying time, furnish gas and oil and furnish their own pilot. Fisher always flew the airplane for H. T. Hackney Company, as well as all other people who used the airplane. It was the Hackney's understanding with Goodson that Goodson would furnish a pilot that met the standards of Hackney's insurance policy. On the day of the accident, the airplane was picked up from a hanger at the Kesterson Company's place of business where the airplane was always stored at the Hackney Company when not in use. According to Campbell, there was no limitation as to where the air-

plane was to go or to land on the day of the crash. Hackney paid Fisher $5.00 per hour for flying time, with a minimum of $25.00 per trip during the time he piloted for Hackney. Hackney set the the terms for payment of pilot separate from that which it was to receive for use of the airplane. The agreement that JFG was to hire its own pilot was made in order for Hackney to comply with the law. Fisher had access to the keys to the aircraft at all times. He had full permission from Hackney to fly the airplane if he made arrangements with the lessee. On the day of the crash, Fisher picked up Goodson and Davis at the Island Home Airport near Knoxville.

The primary question for determination is whether Goodson, Jr.'s death came within Exclusion No. (5) so as to remove it from coverage under the policy.

In order for the exclusion to apply to Goodson, it was necessary for the aircraft to have been operated by the policyholder, JFG, at the time of the crash. The defendant argues that the trip that resulted in the tragedy is a classical situation which brought about the incorporation of Exclusion No. (5) in the policy. The reason for the exclusion, as given by Mr. Delaney, a representative of the defendant, is that the risks in the use of private airplanes which are operated by companies are greater because pilots will take chances to please the officials of the company who desire to make business trips— chances that would not be taken by commercial airlines or independent agencies which operate charter flights. The defendant will write policies for aircraft owned or operated by the policyholder, but only for an increased premium based upon the so-called increased risk.

In the opinion of the Court, the risk was not increased on the occasion of the October 29, 1964 flight for the reason that Fisher, the pilot of the airplane, was not in the private employment of JFG but was regularly employed by a governmental agency. Moreover, he had piloted the aircraft whenever it was used by the Hackney Company and its two subsidiaries, which was two-thirds of the time, and on all occasions when it was rented by the five or six other independent parties who occasionally used the plane. These factors negative the idea that the relation between Fisher and the officials of JFG were such as to be calculated to cause him to take risks in flying the airplane that would not be taken by commercial airlines or charter flight companies. The exclusion should not apply to the flight that is the subject of this suit for the reason that under the facts the conditions of the exclusion did not exist.

The stipulation showed that Goodson, Jr. made arrangements with Fisher to pilot the aircraft on October 29, 1964. The testimony of Campbell, who was the only one who could testify about the agreement between Hackney and Goodson, Jr., stated unequivocally that JFG was to furnish and pay the pilot and that the reason that JFG was to furnish the pilot was to enable the Hackney Company to comply with some legal requirement which was not stated. In substance, the arrangement by JFG to procure Fisher to pilot the airplane was in the nature of a paper arrangement to meet legal technical requirements since Fisher was always employed by Hackney and the other users of the aircraft when the aircraft was flown.

There are various definitions of the word "operated." A definition by Webster's Third New International Dictionary, Unabridged, is as follows:

"1. to perform a work or labor: exert power or influence: produce an effect (a plain reason on the mind of a learned hearer) * * * 2. to produce or take an appropriate effect: issue in the result designed * * * 3. to perform an operation or series of operations * * * to perform surgery * * * to carry on a military or naval action or mission * * * to function through the use of a specified agent * * * 4. to trade or speculate in securities or commodities: act as a dealer or broker in the markets

* * * 5. to follow a course of conduct or way of life, esp. one that is irregular or antisocial * * * vt. 1. to cause to occur: bring about by or as if by the exertion of positive effort or influence: INITIATE * * * 2a: to cause to function usu. by direct personal effort: WORK * * * b: to manage and put or keep in operation whether with personal effort or not * * * 3: to perform surgery on * * *"

Black's Law Dictionary defines it as follows:

"This word, when used with relation to automobiles, signifies a personal act in working the mechanism of the automobile; that is, the driver operates the automobile for the owner, but the owner does not operate the automobile unless he drives it himself."

These various definitions as found in the dictionaries show that the term "operated" has many meanings which in the circumstances of this case creates an ambiguity rather than precisely defining the exclusion.

■ In the light of the partial heading in the policy "Excluding Policyholder Owned Aircraft;" the provision under the subheading "DESCRIPTION OF HAZARDS" to-wit, "Such insurance includes such injury sustained during such trip while the Insured Person is riding as a passenger (but not as a pilot, operator or member of the crew) in or on, boarding or alighting from: (1) any civilian aircraft having a current and valid airworthiness certificate, and piloted by a person who then holds a valid and current certificate of competency of a rating authorizing him to pilot such aircraft * * *" and the provision under the subheading "EXCLUSIONS" that "Such insurance as is afforded an Insured Person to which this Hazard H-12 applies, does not apply to any loss, fatal or non-fatal, caused by or resulting from injury sustained while the Insured Person is: * * * (5) flying in any aircraft owned or operated by the Policyholder, unless previously consented to in writing by the Company," we believe there is sufficient uncertainty in the meaning of the words "operated by" as to create an ambiguity in the policy and the policy should be construed to afford coverage.

■ The language in an insurance policy should be sufficiently plain that a person of average intelligence may know and understand its meaning. National Bank of Commerce v. New York Life Ins. Co., 181 Tenn. 299, 181 S.W.2d 151; Burk v. Mutual Benefit Health and Acc. Ass'n of Omaha, Tenn.App., 388 S.W.2d 628; Couch on Insurance 2d, Sec. 41:544, Vol. 10, p. 450.

"When there is ambiguity as to the exact scope of an aviation exclusion clause, a narrow construction should be given so as to provide coverage for the harm sustained."

The language in large print of the heading "Excluding Policyholder Owned Aircraft" considered in relation to the following provisions in small type namely, "(1) any civilian aircraft having a current and valid airworthiness certificate, and piloted by a person who then holds a valid and current certificate of competency of a rating authorizing him to pilot such aircraft * * *" and "(5) flying in any aircraft owned or operated by the Policyholder, unless previously consented to in writing by the Company," when considered as a whole, is sufficient to afford coverage. Burk v. Mutual Benefit Health and Acc. Ass'n of Omaha, supra.

■ In sum, the Court holds: (a) That the terms of the policy are couched in language which creates an ambiguity and that since the policy was written by the insurance company it should be construed liberally in favor of coverage; (b) that the arrangements between F. P. Goodson, Jr. and the H. T. Hackney Company for the use of the airplane with Fisher as the pilot did not increase the risk of an accident and Exclusion No. (5) does not apply; (c) that there is no basis for a penalty in the case; and (d) the Court, in its discretion, disallows interest.